FOX, Justice.
[¶1] FH (Father) appeals from the juvenile court's Order On Permanency Hearing, which changed the case plan for the minor child from family reunification to adoption and ordered the Department of Family Services (DFS) to cease reunification efforts.
*298 Father contends that, although he was not alleged to have abused or neglected the minor child, the juvenile court violated his due process rights when it did not advise him of his right to counsel and did not appoint an attorney until shortly before the permanency hearing. Father also appeals the juvenile court's denial of his request for transport from the Wyoming Honor Farm to attend the permanency hearing in person. We conclude that Father had a right to appointed counsel regardless of whether neglect proceedings were directed to him, but we affirm the Order On Permanency Hearing because Father has not established that he was prejudiced by the delay in appointing him counsel. We affirm the juvenile court's denial of Father's request for transport to the hearing.
ISSUES
[¶2] We restate the issues as follows:
1. Did the juvenile court commit plain error when it did not advise Father of his right to counsel and did not appoint counsel after Father's initial request?
2. Did the juvenile court deny Father due process of law when it denied his request for transport to the permanency hearing?
FACTS
[¶3] Father and Mother never married, but have one child together, ECH, born in 2012. Father and Mother resided together prior to the State filing the neglect petition. Both Father and Mother have an extensive history of substance abuse and interactions with law enforcement.
[¶4] On May 3, 2016, Mother was arrested on a felony drug charge. Two days later, on May 5, 2016, DFS asked law enforcement officers to conduct a welfare check on the children because of reports that the children were without adult supervision or funds for food or transportation. When the officers arrived at the residence, they found Father hiding in a closet. He had an outstanding municipal warrant and had a syringe on his person, which officers suspected was used to inject methamphetamine. The officers arrested Father and took protective custody of all the children present in the home,[1] as an appropriate caregiver could not be located.
[¶5] The next day, May 6, 2016, the State filed a Neglect Petition, focused on Mother's failure to provide adequate adult supervision for the minor children due to her incarceration. The petition stated that ECH's father was unknown. The juvenile court entered an Order for Predisposition Study and Report and Order to Create a Multi-Disciplinary Team. On May 9, 2016, the juvenile court appointed a guardian ad litem (GAL) to represent the children and held a shelter care hearing.[2] The court placed the children in the legal and physical custody of DFS for placement in foster care and set an adjudication hearing for June 20, 2016. The court appointed Mother counsel on May 10, 2016.
[¶6] After confirming that ECH's birth certificate listed Father and that the state vital records office had an Affidavit Acknowledging Paternity on file, the State filed an Amended Neglect Petition on June 10, 2016.[3] The amended petition explained that it was "amended to correct the name of the minor child [ECH] and to add the acknowledged father, [Father], as a party to the case." The amended petition referenced Father as Mother's significant other, but did not contain any allegations of abuse or neglect against Father. On June 12, 2016, Father was served with the petition and advised of the date and time for the adjudication hearing. The juvenile court entered an order adding *299 Father as a party to the case and amending the caption on June 14, 2016.
[¶7] The State filed a Second Amended Neglect Petition on June 17, 2016, adding allegations against Mother. During the adjudication hearing held on June 20, 2016, Mother admitted the allegations contained in the second amended petition. Father was present during this hearing, and the juvenile court advised Father:
[The Court]: All right.
Before we get to you, [Father], there was a request to add you as a party in this matter as you are the father of record of [ECH] and the Court granted that motion.
I will tell you that at this point there's no allegation pending against you. The reason that the motion was granted was essentially to require you to appear at M.D.T. meetings and to participate in any reunification efforts here since you're the father. That obligation falls to you, but you're not accused of doing anything at this point, okay?
I've not appointed counsel or anything for you right now.
The court did not give Father any additional advisements. At the conclusion of the hearing, the court continued to place legal and physical custody of the children with DFS and permitted supervised visitation between Father and ECH after three consecutive negative urinalysis tests (UAs). Father's first test was positive for methamphetamine. His second test was negative, but he was arrested for felony possession of methamphetamine and incarcerated before he was able to complete any further UAs.
[¶8] Both parents were incarcerated and awaiting sentencing on felony methamphetamine drug charges by the time of the first Multidisciplinary Team (MDT) meeting on July 12, 2016. At that time, Father informed the MDT that grandmother was trying to reach DFS and he had been writing letters to ECH. The MDT discussed grandmother's visitation and ultimately recommended allowing visitation at DFS' discretion after consultation with the GAL and ECH's counselor. Father inquired why grandmother was not asked to care for ECH. Although the MDT minutes do not reflect a response to his inquiry, the DFS worker testified at the permanency hearing that she had met with grandmother on July 1, and at that time grandmother had said "she was not sure that she would be able to do it." Grandmother similarly testified that "I told her I didn't know if I could." At the conclusion of the meeting, the MDT recommended a permanency plan for ECH of reunification with Mother and Father.
[¶9] The juvenile court held the final disposition hearing on August 1, 2016. The court adopted the MDT's recommendation for ECH's permanency goal. The court ordered Father to: (1) participate in or continue with individual counseling and family counseling and follow the recommendations of the counselors; (2) participate in "WrapAround" services; (3) submit to random UAs at DFS' request; (4) participate in and complete parenting classes; and (5) obtain a substance abuse evaluation and follow the evaluation's recommendations. Supervised visitation between Father and ECH would "occur only after three (3) consecutive negative UAs at the discretion of the Department of Family Services and after consultation with the Guardian ad Litem." The court also permitted visitation with grandmother at DFS' discretion after consultation with the GAL and ECH's counselor.
[¶10] The day after the final disposition hearing, DFS completed a case plan incorporating the requirements set forth in the juvenile court's order, with a permanency goal for all of the children as reunification with a concurrent goal of adoption. At the next MDT meeting on October 25, 2016, both parents remained incarcerated, and Father reported that he would be incarcerated for approximately eighteen months. Father and Mother continued to send letters to ECH. Father requested telephone visitation, and Mother's attorney also pushed for more contact between the parents and children. The MDT agreed that the parents should continue with letter writing and move to supervised therapeutic visitation after it was approved by ECH's therapist.
[¶11] The juvenile court held a review hearing on December 12, 2016. Father and *300 Mother could not attend the hearing because of issues with their respective penitentiary facilities, although Mother's attorney was present. After the hearing, the court entered an Order on Review Hearing and Order Setting Permanency Hearing. This order changed the permanency plan from reunification for all of the children, including ECH, to "relative placement with a concurrent goal of guardianship/adoption" without explanation. The court set a permanency hearing for April 28, 2017.
[¶12] The next MDT meeting occurred on January 31, 2017. Aside from mentioning Father was at the Wyoming Honor Farm and DFS was working to update his case plan due to that change, no other mention of Father was made during this meeting.[4] Telephone calls or other forms of visitation between ECH and his parents were still not taking place. The DFS caseworker reported that grandmother attended ECH's birthday party, brought him a gift at Christmas, and was requesting more visitation. The caseworker expressed to the MDT that "they want to make sure this happens in an appropriate way." ECH's counselor informed the team about a personal issue between herself and the foster parents, resulting in ECH's case being transferred to a new counselor. Due to a scheduling conflict, the MDT continued the meeting to another date and did not make recommendations.
[¶13] The MDT reconvened on February 24, 2017. Father informed the team that he was taking several classes, including Responsible Fathers and Inside Out relationship classes. He also told the team he wanted an attorney to represent him in the proceedings. The district attorney suggested Father write a letter to the court requesting the appointment of counsel. The MDT continued discussions about commencing visitation between ECH and his parents. Mother's attorney expressed her frustration that the permanency hearing was approaching and yet little effort had been made toward facilitating any form of visitation with ECH. ECH's new counselor explained that he and ECH were still developing a relationship, having only met twice. The participants discussed ECH's progress and the implementation of telephone and in-person visitation with his parents. Mother's attorney repeatedly urged implementation of parental visitation and expressed her frustration that it had been delayed by the counselor's desire to continue to evaluate how ECH would react to such visits. The GAL informed the team that she would like a concurrent goal of adoption for ECH. At the conclusion of this meeting, the MDT did not have a unanimous recommendation concerning visitation between ECH and his parents. The MDT also did not reach a unanimous recommendation for ECH's permanency goal, and instead provided the following recommendations to the court: (1) family reunification with a concurrent goal of guardianship or adoption, or (2) family reunification without a concurrent plan.
[¶14] Father filed a letter with the juvenile court on February 28, 2017, requesting counsel. In the letter, Father explained that he did not fully understand the case's procedural posture, including what occurred during the review hearing, which he could not attend. He also stated that he had not been through this type of case, was unsure whether he was being treated fairly, and did not know what his rights were, among other things. The juvenile court did not act on Father's request.
[¶15] In March 2017, grandmother contacted the DFS caseworker and met with her to discuss pursuing placement of ECH with her. It was apparent to the DFS worker that grandmother was only willing to take ECH on a temporary basis, and return the child to either or both of his parents upon their release. Grandmother recalled:
Well, I had went in and told [the DFS worker] that I, you know, was thinking maybe that I could do it or whatever, but then, you know, it was like-she said that if I did it, then I would be responsible for him until he was 18. I was under the *301 impression that it would just be until, you know, [Father and Mother] got out of jail and you know. ...
The DFS worker advised her to consult with a lawyer. Grandmother did not pursue placement, saying "nobody's ever explained really anything to me." The juvenile court concluded that "she was hesitant at assuming full-time care for [ECH], still equivocating as to her ability to provide care ...."
[¶16] Prior to the scheduled permanency hearing, the MDT met on April 7, 2017. During this meeting, the DFS caseworker reported that the parents had five or six phone calls with ECH, and she was ready to talk to the parents' facilities about starting in-person visitation. She also stated that grandmother was working with ECH's counselor and would have two visits per month. The DFS caseworker further reported that Father and Mother completed their parenting workbooks and that she provided them photos of ECH. Father stated that he was continuing to attend classes at the Wyoming Honor Farm, and disclosed that his earliest eligibility for parole was May 2018. Given the length of time before Father and Mother would be released from incarceration, the GAL recommended moving in a different direction for permanency and again advocated for a concurrent plan of adoption. At the conclusion of the MDT meeting, the majority of the team recommended changing the permanency plan to adoption.
[¶17] After learning of the new permanency recommendation, Mother's attorney requested an evidentiary hearing and sought to vacate the permanency hearing originally set for April 28, 2017. The juvenile court granted Mother's request and set an evidentiary permanency hearing for June 29, 2017. Having received no response from the juvenile court to his February 2017 request, on May 15, 2017, Father filed a Motion for Appointment of Counsel and attached an Affidavit of Indigency. On May 25, 2017, Father also requested an evidentiary hearing. On May 26, 2017, the court entered an Order Appointing Counsel for Father, pursuant to Wyo. Stat. Ann. § 14-3-422(c). The juvenile court entered an Order Confirming Evidentiary Permanency Hearing on May 26, 2017, and served it on Father and his counsel. Father did not request a continuance.
[¶18] On June 14, 2017, Father's attorney filed a motion requesting Father be transported from the Wyoming Honor Farm to the Albany County courthouse for the permanency hearing. The juvenile court denied Father's request, but permitted him to appear by telephone.
[¶19] The juvenile court held an evidentiary permanency hearing on June 29, 2017. Father's counsel was present, and Father appeared by phone. The court entered its Order on Permanency Hearing on July 3, 2017. The court determined that DFS provided reasonable efforts at family reunification, and adoption was in ECH's best interest based on the parents' history of unfitness, inability to provide for ECH's basic daily needs, extensive criminal and substance abuse histories, and ECH's progress in his current placement. The court changed the permanency plan for ECH to adoption and ordered reunification efforts to cease immediately. Father filed a timely notice of appeal on August 2, 2017, and moved the juvenile court to stay the order pending the appeal. The court granted Father's motion for stay on August 7, 2017.
DISCUSSION
I. Did the juvenile court commit plain error when it did not advise Father of his right to counsel and did not appoint counsel after Father's initial request?
[¶20] Father contends that the juvenile court violated his due process rights when the court failed to advise Father of his right to representation by counsel at his first appearance before the court and failed to appoint Father counsel following his written request in February 2017. The State counters that the Child Protection Act (the Act) does not require advisement of the right to counsel for parents who are not the subject of abuse or neglect allegations. The State also contends that the court did not err by failing to appoint Father counsel on his initial request because Father did not include a financial statement, and, regardless, any error was harmless due to the appointment of *302 counsel prior to the permanency hearing. Because we determine that Father's statutory rights to both the advisement and appointment of counsel were violated, we need not reach the question of whether a constitutional right to counsel separately exists. See , e .g ., Wilson v. Bd. of Cty. Comm'rs of Cty. of Teton , 2007 WY 42, ¶ 14, 153 P.3d 917, 922 (Wyo. 2007) (stating we will not address constitutional issues if we are able to resolve the case on other grounds).
[¶21] Father did not raise the juvenile court's failure to advise him of the right to counsel in the juvenile court proceedings, even after the court appointed his attorney in May 2017.[5] Normally, we will not consider an issue raised for the first time on appeal, In re AGS , 2014 WY 143, ¶ 33, 337 P.3d 470, 480 (Wyo. 2014), but we have recognized "two exceptions to this rule: when the issue raises jurisdictional questions or when the issue is of such a fundamental nature that it must be considered. Termination of parental rights 'affect the fundamental liberty of familial association.' " In interest of DT , 2017 WY 36, ¶ 23, 391 P.3d 1136, 1143 (Wyo. 2017) (citations omitted). A change in permanency plan is not termination; however, as we recognized in KC v. State , 2015 WY 73, 351 P.3d 236 (Wyo. 2015), the decision to halt reunification efforts certainly affects a parent's substantial rights, as it will likely have a significant impact on a termination decision. Id . at ¶ 38, 351 P.3d at 246 ("It is usually a foregone conclusion that once a permanency plan is changed from family reunification to adoption or other permanent placement outside the home, an action to terminate parental rights will eventually be filed.") The right to counsel in a permanency hearing where cessation of reunification efforts has been recommended is a matter of such fundamental nature that we must consider it even though it was not raised below.[6] We will therefore consider the issue of the delay in appointing counsel for Father, applying a plain error standard of review. W.R.A.P. 9.05.
Plain error occurs when "1) the record is clear about the incident alleged as error; 2) there was a transgression of a clear and unequivocal rule of law; and 3) the party claiming the error was denied a substantial right resulting in material prejudice." "The appellant bears the burden of proving plain error[.]"
In interest of DT , 2017 WY 36, ¶ 23, 391 P.3d at 1143 (citations omitted).
[¶22] Father claims that: (1) the record is clear that the juvenile court failed to advise him of a right to counsel and failed to appoint counsel on his written request in February 2017; (2) the law clearly and unequivocally grants him a statutory right to be advised of a right to counsel and to be appointed counsel on request, as well as a constitutional right to counsel; and (3) the juvenile court denied him a substantial right, resulting in material prejudice. The State concedes that the record is clear that the juvenile court did not advise Father of a right to counsel and did not act on Father's initial request for counsel, satisfying the first element of the plain error analysis.
*303 [¶23] With respect to the second element, a transgression of a clear and unequivocal rule of law, the State acknowledges that Wyo. Stat. Ann. § 14-3-422(a) requires the juvenile court to advise the "child's parents" of "their right to be represented by counsel at every stage of the proceedings including appeal," but contends that the advisement is limited to parents alleged to have abused or neglected their child and entitled to an initial hearing, thus excluding Father.
[¶24] Our rules of statutory interpretation are well known:
In interpreting statutes, our primary consideration is to determine the legislature's intent. All statutes must be construed in pari materia and, in ascertaining the meaning of a given law, all statutes relating to the same subject or having the same general purpose must be considered and construed in harmony. Statutory construction is a question of law, so our standard of review is de novo . We endeavor to interpret statutes in accordance with the legislature's intent. We begin by making an inquiry respecting the ordinary and obvious meaning of the words employed according to their arrangement and connection. We construe the statute as a whole, giving effect to every word, clause, and sentence, and we construe all parts of the statute in pari materia . When a statute is sufficiently clear and unambiguous, we give effect to the plain and ordinary meaning of the words and do not resort to the rules of statutory construction. Moreover, we must not give a statute a meaning that will nullify its operation if it is susceptible of another interpretation.
Town of Pine Bluffs v. Eisele , 2017 WY 117, ¶ 9, 403 P.3d 126, 128-29 (Wyo. 2017) (citations omitted).
[¶25] Wyo. Stat. Ann. § 14-3-409 (LexisNexis 2017) requires the juvenile court to provide certain advisements at the shelter care hearing, including an advisement of the right to counsel:
(b) At the commencement of the hearing the judge shall advise the child and his parents , guardian or custodian of:
....
(ii) Their right to counsel as provided in W.S. 14-3-422 [.]
(Emphasis added.) Wyo. Stat. Ann. § 14-3-422 (LexisNexis 2017) also requires the court to advise the child's parents of their right to counsel:
(a) At their first appearance before the court and at their initial hearing the child's parents , guardian or custodian shall be advised by the court of their right to be represented by counsel at every stage of the proceedings including appeal , and to employ counsel of their own choice.
(b) The court shall upon request appoint counsel to represent the child's parents , guardian or custodian if the child's parents, guardian or custodian are unable to obtain counsel. If appointment of counsel is requested, the court shall require the child's parents, guardian or custodian to verify their financial condition under oath, either by written affidavit signed and sworn to by the parties or by sworn testimony made a part of the record of the proceedings. The affidavit or sworn testimony shall state they are without sufficient money, property, assets or credit to employ counsel in their own behalf. The court may require further verification of financial condition if it deems necessary.
(Emphasis added.) We held in In re MN , 2007 WY 189, 171 P.3d 1077 (Wyo. 2007) ( MN II ) that statutory language stating that, after a petition to terminate parental rights has been filed, "the court shall appoint a guardian ad litem," unless it finds the interests of the child do not require one, left the court with "no discretion beyond the two statutory options." Id . at ¶¶ 3, 6, 171 P.3d at 1079, 1080-81. "[W]e have repeatedly found the word 'shall' in a statute to be mandatory." Id. at ¶ 5, 171 P.3d at 1080.
[¶26] The State attempts to avoid this mandatory language by arguing that "parent" is limited to parents facing abuse or neglect allegations. It points to the phrase "initial hearing" at Wyo. Stat. Ann. § 14-3-422(a) to suggest that only a parent accused of abuse and neglect would be present at such a hearing. But this reading of the statute disregards the plain and unambiguous *304 definition of "parent," which the Act defines as "either a natural or adoptive parent of the child, a person adjudged the parent of the child in judicial proceedings or a man presumed to be the father under W.S. 14-2-504." Wyo. Stat. Ann. § 14-3-402(a)(xiii) (LexisNexis 2017). "This Court is not at liberty to add words to a statute that the legislature chose to omit." Wyodak Res. Dev. Corp. v. Wyo. Dep't of Revenue , 2017 WY 6, ¶ 31, 387 P.3d 725, 733 (Wyo. 2017) (citing MF v. State , 2013 WY 104, ¶ 11, 308 P.3d 854, 858 (Wyo. 2013) (stating "we will not supply missing terms or expand a statute's meaning beyond its plain language") ). "The omission of words from a statute must be considered intentional on the part of the legislature. Words may not be supplied in a statute where the statute is intelligible without the addition of the alleged omission." In re Adoption of Voss , 550 P.2d 481, 485 (Wyo. 1976) (internal citations omitted).
[¶27] Where the legislature desired to distinguish "parents" based on whether they were alleged within the Act to have abused or neglected the child, it has done so expressly. For example, Wyo. Stat. Ann. § 14-3-423(a)(ii) & (iii) (LexisNexis 2017) grants a "party" several significant rights, including the right to confront and cross-examine witnesses, introduce evidence, present witnesses, and otherwise be heard in his own behalf. The right to demand a trial by jury, however, is limited to "[a] party against whom a petition has been filed" or the district attorney. Wyo. Stat. Ann. § 14-3-423(b) ; see also Wyo. Stat. Ann. § 14-3-413(d) (LexisNexis 2017) (requiring a notice be served on a "noncustodial parent ... who is not alleged in the petition to have abused or neglected the child."). Wyo. Stat. Ann. § 14-3-422(a) lacks similar words of qualification.
[¶28] The State's reliance on the legislature's use of "non-custodial" parent in Wyo. Stat. Ann. § 14-3-413 to support its efforts to limit the plain meaning of the word "parent" is also misplaced. The State argues that this provision illustrates the Act's intent of dividing "parents" into two categories: (1) a parent alleged to have abused or neglected a child; and (2) a "non-custodial parent or putative father who has not had parental rights to the child removed by a court, and who is not alleged in the petition to have abused or neglected the child." Wyo. Stat. Ann. § 14-3-413(d). Aside from the fact that the record contains no evidence of Father's custodial status, we will not bootstrap the distinction between custodial and non-custodial parents at Wyo. Stat. Ann. § 14-3-413 to limit the plain and ordinary definition of "parent" at Wyo. Stat. Ann. § 14-3-402(a)(xiii).
[¶29] Wyo. Stat. Ann. § 14-3-409(b) requires a juvenile court to advise the child's parents of their right to counsel at the shelter care hearing, and Wyo. Stat. Ann. § 14-3-422(a) requires a juvenile court to advise the child's parents, and others, of their right to counsel "[a]t their first appearance before the court and at their initial hearing." (Emphasis added.) Contrary to the State's argument, Wyo. Stat. Ann. §§ 14-3-409(b) & 14-3-422(a) cannot be fairly read as a limitation on which parent has a right to counsel and to be advised of that right. We decline to read into the Act a limitation that the legislature did not intend. Wyo. Stat. Ann. § 14-3-422(a) unambiguously requires the juvenile court to advise the child's parents, whether accused or not, of their right to counsel at multiple stages of the proceedings. Father was not advised of this right at his first appearance before the juvenile court and, thus, the court transgressed a clear and unequivocal rule of law.
[¶30] In addition, Wyo. Stat. Ann. § 14-3-422(b) clearly and unequivocally grants Father, the child's parent, a statutory right to the appointment of counsel upon request. Father submitted a written request for counsel on February 28, 2017. The State argues that Father failed to include a statement of his financial condition, which relieved the juvenile court from acting on his request. However, Wyo. Stat. Ann. § 14-3-422(b) does not require that a request for counsel be contemporaneously accompanied by a financial statement, but instead places the burden on the court to require it. The statute provides:
... If appointment of counsel is requested, the court shall require the child's parents, guardian or custodian to verify their financial condition under oath, either by written *305 affidavit signed and sworn to by the parties or by sworn testimony made a part of the record of the proceedings.
Wyo. Stat. Ann. § 14-3-422(b).
[¶31] The juvenile court transgressed a clear and unequivocal rule of law both when it failed to advise Father of his right to counsel at his first appearance as a parent and party in the neglect proceeding, and when it did not require Father to verify his financial condition after he requested counsel, so that it could proceed with the appointment of counsel.
[¶32] The final element of our plain error analysis is whether Father was "denied a substantial right resulting in material prejudice." In interest of DT , 2017 WY 36, ¶ 23, 391 P.3d at 1143 (citation omitted). The State contends that the juvenile court's failure to advise Father of his right to counsel and failure to appoint counsel on Father's initial request did not result in a denial of a substantial right because Father's parental rights remain intact until severed by a separate termination of parental rights proceeding. The State's argument overlooks our recognition that a parent's substantial rights are affected when the permanency plan is changed from reunification to termination, and adoption and reunification efforts are halted. KC , 2015 WY 73, ¶ 33, 351 P.3d at 245. In KC , we explained that providing parents an early opportunity to defend against charges of abuse and neglect is important "[b]ecause 'termination proceedings are largely based on the parent's conduct from the time the child is taken into custody until the court decides further assistance to the parent is futile ....' " Id . at ¶ 37, 351 P.3d at 246 (quoting State of New Mexico ex rel. Children v. Maria C. , 136 N.M. 53, 94 P.3d 796, 807 (App. 2004) ). Father had a substantial right to be represented at a proceeding that is likely the precursor to termination of his parental rights.
[¶33] While the change in permanency plan did affect a substantial right, Father must demonstrate material prejudice-"a reasonable possibility exists that, absent the error, the appellant may have enjoyed a more favorable outcome." Schreibvogel v. State , 2010 WY 45, ¶ 26, 228 P.3d 874, 884 (Wyo. 2010) (citing Foster v. State , 2010 WY 8, ¶ 15, 224 P.3d 1, 7 (Wyo. 2010) ). "When determining whether material prejudice is present, we review the evidence in light of the entire record." Mersereau v. State , 2012 WY 125, ¶ 53, 286 P.3d 97, 118 (Wyo. 2012) (citing Pendleton v. State , 2008 WY 36, ¶ 11, 180 P.3d 212, 216 (Wyo. 2008) ).
[¶34] The State asserts that, had Father been advised of his right to counsel and had the court appointed counsel immediately following his first request, the outcome would not have been more favorable because Father had counsel at all critical stages of the proceeding (i.e., the permanency hearing), he participated in MDT meetings and the case planning process, he received visitation and communication with his child, and DFS considered kinship placement. The State contends that the "only prejudice Father suffered was at his own hands, from his own continued criminal conduct, which kept him from being able to care for his child."
[¶35] Father does not precisely explain how the placement outcome may have been different if he had been represented at every stage of the proceedings, but in his discussion of prejudice, he focuses primarily on the possibility that, had they been represented, he and grandmother would have pursued the possibility of kinship placement and thus avoided the change in permanency plan to adoption. Considering the concerns grandmother expressed about taking over ECH's care, see supra ¶ 15, we cannot conclude that there is a reasonable possibility ECH would have been placed in grandmother's care.
[¶36] Father suggests that, if he and grandmother had been represented, they would have been informed that one basis for termination of parental rights is that "the child has been in foster care under the responsibility of the state of Wyoming for fifteen (15) of the most recent twenty-two (22) months, and a showing that the parent is unfit to have custody and control of the child." Wyo. Stat. Ann. § 14-2-309(a)(v). They would have understood the importance of seeking ECH's placement with grandmother, and pursued it more aggressively.
*306 [¶37] If a child is in foster care and under State responsibility for fifteen of the most recent twenty-two months, the State must file a petition to terminate parental rights. Wyo. Stat. Ann. § 14-3-431(m) (LexisNexis 2017). We have held that physical placement of the child with a relative does not necessarily change the fact that the child remains in DFS custody.
("[D]espite the fact that the children's grandparents had physical custody of the children, it is undisputed that DFS was granted legal custody after the children were adjudicated neglected, and that DFS has retained legal custody throughout these proceedings."). Moreover, we have previously examined this issue and found that physical placement with relatives qualifies as foster care when the State has been granted legal custody of a child. Id. (finding that the term "foster care" is not limited to "care provided by non-relatives," but also encompasses relative care when the State has legal custody of the child).
In re AGS , 2014 WY 143, ¶ 22, 337 P.3d at 478 (quoting In re ZMETS , 2012 WY 68, ¶ 19, 276 P.3d 392, 397-98 (Wyo. 2012) ). Nevertheless, the Act relieves the State from the requirement that it file a termination petition if "[t]he child is in the care of a relative." Wyo. Stat. Ann. § 14-3-431(m)(i). Father neither refers to this exception nor explains how prior knowledge of the exception might have alleviated grandmother's concerns.
[¶38] Father also complains generally that DFS did not diligently follow its case plan to allow Father more phone contact and visitation with ECH. The juvenile court recognized:
70. It is also true that there have been hurdles toward reunification efforts caused, largely, by the parents' incarceration at various locations. Still, the Department of Family Services and others involved in this case have facilitated written and telephonic contact between [ECH] and his parents and, more recently, undertaken efforts at in-person contact at the penal institutions where [Mother] and [Father] are housed. The Department of Family Services has not been perfect in its efforts and, perhaps, visitation-telephonic and personal-could have been commenced sooner. However, this Court is not exceedingly critical of the efforts undertaken here, where DFS was proceeding upon the advice of two counselors and the foster parents who noticed adverse effects on [ECH] when there was any form of contact involving his parents.
[¶39] "At the permanency hearing, the court must determine whether the permanency plan is in the best interests of the child and whether DFS has made reasonable efforts to finalize the plan." KC , 2015 WY 73, ¶ 25, 351 P.3d at 243 (citing Wyo. Stat. Ann. § 14-3-431(k) ). The juvenile court here concluded that DFS "made reasonable efforts at family reunification throughout this case, particularly considering what services have been accessible, available, and appropriate given the parents' incarceration." Father has not appealed this determination, except indirectly by suggesting that more effective reunification efforts would have been pursued if he had been represented by counsel. We therefore do not examine the juvenile court's determination that DFS made reasonable efforts at reunification. Father complains that reunification efforts, in the form of telephone and in-person contacts between him and ECH, would have been more robust if he had been represented by counsel. But Father's belief that this outcome might have been different had he been represented, absent additional factual or legal support, does not satisfy his burden of demonstrating a reasonable possibility that the outcome would have been different.
[¶40] Further, the number of contacts the parents had with ECH was not the basis for the juvenile court's decision to change permanency. Instead, the court found:
71. Still, there is a much larger picture that must be considered. As far as [Father],
a. [Father] has six different children, none of whom are in his custody. He has two children with [M.S.], who are in her custody. He has one child with [C.W.], who is in the custody of the child's great-grandmother. He has one child with [T.C.], for whom he relinquished his parental rights during a prior period of *307 incarceration. He has one child with [A.P.], who is in her custody and their whereabouts are unknown after [A.P.] fled when a warrant for her arrest was issued. Finally, he has one child, [ECH] with [Mother], who is currently placed in foster care.
b. At the time [ECH] was placed into protective custody on May 5, 2016, [Father] was found hiding in a closet in the residence because there was a warrant out for his arrest. He was arrested on that date, and was discovered to have methamphetamine on his person.
c. [Father] has an extensive criminal history, dating back to the age of eighteen. He has multiple felony convictions. In 2004, [Father] was convicted of Aggravated Assault for choking, hitting, and shaking a woman who was pregnant with his child at the time. For this offense, he was placed on five (5) years of probation, which he violated and was sentenced to six (6) years of incarceration.
d. He has a lengthy history of substance abuse. He has previously been incarcerated; on probation; and a participant of the Albany County Court Supervised Treatment Program (Drug Court). He previously completed the Therapeutic Community Program at the Casper Reentry Center, the very program which he now hopes to complete[ ] again in the assertion that it will establish a "clean and sober" lifestyle for him this time. In the past, he has participated in Intensive Outpatient Treatment and Moral Recognition [sic] Therapy at Peak Wellness Center. Despite all these past efforts at rehabilitation, [Father] remains an addict, even to the extent that he was found in possession of methamphetamine after [ECH] was placed in protective custody and while he was out on bond on other felony drug charges.
e. [Father] has been placed on probation three times, with revocation paperwork being filed in two of the three, both of which alleged continuing substance abuse in addition to other violations.
(Emphasis in original.)
[¶41] Given these undisputed facts, we cannot conclude that additional contacts between Father and ECH would have changed the outcome of the juvenile court's permanency decision. Because Father has not met his burden of demonstrating material prejudice arising from the court's delay in appointing him counsel, we find no plain error.
II. Did the juvenile court deny Father due process of law when it denied his request for transport to the permanency hearing?
[¶42] Father contends that his statutory and constitutional due process rights were violated because the juvenile court denied his request for transport from the Wyoming Honor Farm to attend the permanency hearing in person, even though Father attended the hearing by telephone while his counsel was present in the courtroom.
[¶43] Father properly preserved this due process issue. "[W]hether an individual was afforded due process is a question of law that we ... review de novo." KC , 2015 WY 73, ¶ 16, 351 P.3d at 241 (citation omitted). "The party claiming an infringement of his right to due process has the burden of demonstrating both that he has a protected interest and that such interest has been affected in an impermissible way. The question is whether there has been a denial of fundamental fairness." Id . (citations omitted).
[¶44] We first consider whether the governing statute provides relief. The Act provides:
(a) The court shall insure the presence at any hearing of the parents, guardian or custodian of any child subject to the proceedings under this act.
Wyo. Stat. Ann. § 14-3-415(a) (LexisNexis 2017). As previously discussed, see supra ¶ 25, the word "shall" means mandatory. The question for our determination is the meaning of "presence."
We look first to the plain and ordinary meaning of the words used in a statute to *308 determine if it is ambiguous. A statute is clear and unambiguous if its wording is such that reasonable persons are able to agree on its meaning with consistency and predictability. Conversely, a statute is ambiguous if it is found to be vague or uncertain and subject to varying interpretations. ... Whether a statute is ambiguous is a matter of law that is determined by this Court.
State ex rel. W. Park Hosp. Dist. v. Skoric , 2014 WY 41, ¶ 11, 321 P.3d 334, 338-39 (Wyo. 2014) (internal citations and quotation marks omitted). Does "presence" mean physical presence in the courtroom, as Father contends? Or is telephone testimony adequate to satisfy the "presence" requirement, as the State argues? "Most actions in juvenile court are considered civil in nature." Brown v. State , 2017 WY 45, ¶ 22, 393 P.3d 1265, 1274 (Wyo. 2017) (citations omitted); see also Lassiter v. Dep't of Social Servs. , 452 U.S. 18, 25, 101 S.Ct. 2153, 2158, 68 L.Ed.2d 640 (1981) (termination of parental rights proceeding is civil not criminal). "Presence" in civil cases has a different significance than it does in criminal cases, where other constitutional guarantees are in play. See People in Interest of C.G. , 885 P.2d 355, 357 (Colo. Ct. App. 1994). We find that "presence," in the context of a proceeding under the Child Protection Act, Wyo. Stat. Ann. §§ 14-3-401 through 441, is uncertain and subject to varying interpretations. When the language is ambiguous,
the court must look to the mischief the statute was intended to cure, the historical setting surrounding its enactment, the public policy of the state, the conclusions of law, and other prior and contemporaneous facts and circumstances, making use of the accepted rules of construction to ascertain a legislative intent that is reasonable and consistent.
In re DSB , 2008 WY 15, ¶ 17, 176 P.3d 633, 637 (Wyo. 2008) (citations and quotation marks omitted).
[¶45] The legislative intent of the "presence" requirement was in large part to preserve the due process rights of the child's parent, guardian, or custodian. See Seherr-Thoss v. Teton Cty. Bd. of Cty. Comm'rs , 2014 WY 82, ¶ 17, 329 P.3d 936, 944 (Wyo. 2014) (citations omitted) (legislature is presumed to have intended a reasonable, just, and constitutional result). A parent has "a due process right to meaningful participation at permanency hearings when the State seeks to change permanency from family reunification to another status that will require termination of parental rights." In interest of DT , 2017 WY 36, ¶ 28, 391 P.3d at 1136 (quoting KC , 2015 WY 73, ¶ 38, 351 P.3d at 246 ).
[¶46] A majority of states have held that the extent of an incarcerated parent's right to be present at a termination hearing should be determined in the discretion of the trial court, "while finding that representation by counsel and the opportunity to appear [in some form] are the two key components ...." In re C.G. , 954 N.E.2d 910, 921 (Ind. 2011) (citing cases).[7] The process due "must be evaluated in light of the process received throughout the proceedings and must be proportionate to the issues at stake." KC , 2015 WY 73, ¶ 39, 351 P.3d at 246. Due process "is not a technical conception with a fixed content unrelated to time, place and circumstances. ... [It] is flexible and calls for such procedural protections as the particular situation demands." Id. (quoting Mathews v. Eldridge , 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.E.d.2d 18 (1976) ). By permitting Father to appear by telephone while Father's counsel was present in the courtroom, the juvenile court afforded Father due process. Father exercised his rights to "put the State to its proof, to be present, *309 to confront and cross-examine witnesses, to call witnesses, and to present a case in support of continued plan of reunification or dismissal of the case." In interest of DT , 2017 WY 36, ¶ 28, 391 P.3d at 1145 (quoting KC , 2015 WY 73, ¶ 44, 351 P.3d at 247 ); see also Maria C. , 94 P.3d at 805 (citation omitted) ("The opportunity to be heard in a 'meaningful manner,' generally includes an opportunity to review and present evidence, confront and cross examine witnesses, and consult with counsel, either by way of an informal or formal hearing."). Thus, Father meaningfully participated in the permanency hearing, the juvenile court did not violate his constitutional due process rights by declining to issue a transport order, and the legislative intent underlying its use of the word "presence" in the Child Protection Act is satisfied.
CONCLUSION
[¶47] The juvenile court transgressed a clear and unequivocal rule of law when it failed to advise Father of his right to counsel at his first appearance in the proceeding and thereafter failed to act on Father's initial request for appointment of counsel. Father has not established, however, that these errors materially prejudiced him, and therefore we find no plain error. Father's due process rights were not violated when the juvenile court denied his request for transport from the Wyoming Honor Farm to appear in person at the permanency hearing. We therefore affirm the juvenile court's Order on Permanency Hearing.

Mother was the caregiver for her half-siblings, ages 14 and 17, whose parents are deceased.

It appears that the initial hearing was held in conjunction with the shelter care hearing, based on the advisements given to Mother in the Order on Shelter Care Hearing and Order Setting Adjudication Hearing entered on May 13, 2016, as permitted by Wyo. Stat. Ann. §§ 14-3-409(c) and 14-3-426(a).

The juvenile court's Order on Permanency Hearing twice states that the Amended Neglect Petition identifying Father was filed June 10, 2017, suggesting it may have based its ruling, in part, on a misunderstanding regarding when Father was identified.

The district attorney filed Father's updated case plan, dated February 10, 2017, with the juvenile court on March 28, 2017. The case plan provided for telephonic and in-person visits scheduled at the discretion of ECH's therapist, in consultation with DFS and the GAL, "when therapeutically appropriate."

Although Father's counsel touched on Father's lack of representation in his questioning and argument at the permanency hearing, he did not seek a ruling on any perceived error or provide the juvenile court with any legal authority to support a claim arising from it. The issue was not squarely before the juvenile court. See , e .g ., KC v. State , 2015 WY 73, ¶ 49, 351 P.3d 236, 248 (Wyo. 2015) (doubting a "comment made by Mother's counsel was sufficient to constitute a claim that she was being denied due process").

We explained in Crofts v. State ex rel. Dep't of Game & Fish , 2016 WY 4, ¶ 24, 367 P.3d 619, 625 (Wyo. 2016), that
[a]n appellant's assertion of a "fundamental right" does not necessarily persuade this Court to consider the issue for the first time on appeal. Rather, we will recognize an exception to the rule "for an issue that 'is of such a fundamental nature that it must be considered.' " Kordus [v. Montes ], 2014 WY 146, ¶ 10, 337 P.3d [1138,] 1141 [ (Wyo. 2014) ] (emphasis added) (quoting Utley v. Lankford (In re Guardianship of Lankford ), 2013 WY 65, ¶ 28, 301 P.3d 1092, 1101 (Wyo. 2013) ). We have "declined to address newly raised issues that present constitutional questions where nothing more is shown to compel the Court's review[,]" Utley , 2013 WY 65, ¶ 29, 301 P.3d at 1101....
However, "[w]e have recognized that the right to familial association is a fundamental issue that permits us to consider [a parent's] claim." Womack v. Swan , 2018 WY 27, ¶ 11, 413 P.3d 127, 133 (Wyo. 2018) (citing Tracy v. Tracy , 2017 WY 17, ¶¶ 22, 23, 388 P.3d 1257, 1262 (Wyo. 2017) ).

If due process does not require a physical presence at a termination of parental rights hearing, it follows that due process does not require a physical presence at a permanency hearing, where Father's parental rights have not been permanently severed. Although both proceedings are important, key differences exist which elevate the importance of the termination of parental rights proceeding. See , e .g ., KC , 2015 WY 73, ¶ 27, 351 P.3d at 244 (explaining that "[a]t the termination-of-parental-rights (TPR) hearing, a full gamut of procedural rights and processes come into play: the Wyoming Rules of Civil Procedure, including the right to a jury trial, and the Wyoming Rules of Evidence apply.").